THE NEW YORK AND BROOKLYN FERRY COMPANY, Appellant, *v.* JOHN H. MOORE, Respondent.

THE NEW YORK FERRY CO., Appellant, *v.* THE SAME, Respondent.

*Court of Appeals.    April 13, 1886.*

1. *Reversal upon the law only.*—Where the reversal of a judgment entered upon the decision of the court is upon the law only, the court of appeals does not have to deal with the weight of the evidence, but simply to determine whether there was any evidence which authorized the findings of the essential facts.

2. *Amount of proof.*—Courts, in weighing evidence and reaching conclusions, do not deal' with possibilities, but with probabilities. A mistake may be made in reaching the conclusion, but mistakes cannot be eliminated from the administration of justice by human tribunals. No more certainty in proof is required than is ordinarily practicable; and the competent proof, which will ordinarily satisfy a reasonable person, should satisfy a court, and justify its judgment.

3. *Same.*—There is no rule of law which requires a plaintiff in a civil action, when a judgment against the defendant may establish his guilt of a crime, to prove his case with the same certainty as is required in criminal prosecutions. Nothing more is required in such cases than a just preponderance of evidence, provided the defendant is given the benefit of the presumption of innocence.

4. *Witness.   Refusal to testify.*—The refusal of a party, in a civil action to be sworn as a witness, when confronted by a strong case of circumstantial evidence, goes far to overthrow the presumption of innocence to which he would otherwise be entitled, and which might solve a doubtful case in his favor.

5. *Witness.   Credibility.*—While a court is bound to believe a disinterested, unimpeached, uncontradicted witness who gives evidence not in any way discredited, or in itself improbable or incredible, it is not bound to give credit to a witness who is interested in the result of the action, and whose evidence is improbable, and discredited by circumstances, or is against common experience and observation.

These actions, afterwards consolidated and tried together,

were brought to recover, and charge upon certain deposits and real estate of the defendant, John H. Moore, the amount of moneys alleged to have been received by him as agent of the plaintiffs, and converted to his own use by investment in such real estate, or by making such deposits of the same in his own name, or in that of his mother, in certain savings banks, which were also made defendants.

Appeal from a judgment of the general term of the supreme court, reversing judgment in favor of plaintiff entered upon the decision of the court without a jury.

*W. C. De Witt*, for appellants.

*James M. Smith*, for respondents.

EARL, J.—The New York and Brooklyn Ferry Company, a corporation, owned and operated ferries between the cities of New York and Brooklyn, from 1864 to May 1, 1879, and the New York Ferry Company, a successor to the former company, owned and operated the same ferries from the latter date to the commencement of these actions. The actions were consolidated and tried together as one action, and one judgment was entered for the joint benefit of both plaintiffs, and therefore I will speak of them in this opinion as one action.

The complaint alleges that from about the 1st day of December, 1870, to the 16th day of January, 1883, the defendant John H. Moore was employed by the plaintiff as ferry master, and that as such he received a large amount of money for tolls, which it was his duty to pay over to the plaintiff; that he had retained and converted to his use a large amount of such tolls, and had deposited the same in his own name, and in the name of his mother, in various savings banks, which were made defendants in this action; that he had also purchased certain real estate therewith, which is particularly described in the complaint; that the

plaintiff was ignorant of the items and amounts and dispositions of the moneys so retained and converted, and judgment was demanded that the defendant John H. Moore account for the money received by him as plaintiff's ferry master, and disclose the dispositions and investments of the same; that the deposits in the savings banks and the real estate be impressed with trusts in favor of the plaintiff, and that the plaintiff should have other relief particularly specified.

John H. Moore and Margaret Moore, his mother, severally answered the complaint, putting in issue the material allegations thereof. The issues thus joined were brought to trial at a special term of the supreme court, and the court found that Moore entered the employ of plaintiff in 1866, as night watchman; that in 1867 he was made bridge-tender and gate-man, and December 1, 1870, was made ferry master, and continued in that capacity until he was discharged, January 17, 1883; that it was his duty to receive fees or tolls for teams and persons crossing plaintiff's ferries, and pay over the whole thereof to the plaintiff; that in his capacities above mentioned he collected and received large sums of money; that he did not pay over the whole thereof to the plaintiff, nor render to it a full, complete and fair statement thereof, but fraudulently retained and converted to his own use a large amount of the moneys so received for the plaintiff, amounting to at least the sum of $22,869.68, which was deposited with other moneys in the savings banks, and invested in the real estate mentioned in the complaint, and it ordered judgment for the plaintiff, in respect of that sum, substantially according to the prayer of the complaint. The defendants, Moore, having filed exceptions to the findings and conclusions of the court, appealed to the general term, where the judgment of the special term, was reversed, and a new trial was ordered for errors of law only. The plaintiff then appealed to this court.

It is not disputed that upon the facts found the plaintiff

was entitled to the judgment given at the special term.
The general term reversed the judgment on the ground that
there was no evidence to warrant the findings that the
plaintiffs had lost any money, or that Moore had wrong-
fully retained or embezzled any; and such is now the claim
of Moore and his mother.  As the reversal was upon the law
only, we have not to deal with the weight of the evidence, but
simply to determine whether there was any evidence which
authorized the findings of the essential facts.  It was im-
possible for the plaintiff to furnish any direct evidence of
the precise extent of Moore's misconduct.  He kept no
account, and was not required to keep any, of the moneys
received by him for tolls, and the plaintiff had no means of
knowing how much money he received.  At the end of
each day it was his duty to place all the tolls received by
him, together with a statement of the amount thereof, in a
bag, and deliver the bag at the plaintiff's office.  But it had
no means of knowing whether the bag contained all the
tolls collected during the day.  It was able, however, to
give evidence which we think fully justified the findings of
the special term and the judgment there given.

Moore was born in 1841, of poor parents.  For several
years prior to his death, about the year 1856, his father was
a day laborer, and his mother did washing for other people
in the way ordinarily done by poor women.  Before the
death of the father his family consisted of his wife, the de-
fendant Moore, and three young daughters, and they lived
in a cheap house, where they hired three rooms.  The
daughters began to work at about the age of fourteen; the
eldest about 1850, continuing so to do until her marriage,
in 1857; the second one about 1860, continuing to do so
until her marriage, in 1867; and the youngest, about 1861,
continuing so to do until her death, in 1866.  In 1862 the
son, John H., enlisted in the army, and prior to that time
the family were apparently poor, having no visible property
except a small amount of cheap furniture.  When John H.

enlisted, he received a bounty, and then his mother opened a bank account in the Williamsburgh Savings Bank in the joint names of herself and her son, and deposited therein the bounty received by her son, and other money received by him, from time to time, during the war, and afterwards down to January 1, 1867, when the total deposits standing in their joint names amounted to $699.68. After he returned from the war until he entered the employment of the plaintiff, he was hired as the driver of a truck for wages at seven dollars per week. When he applied to the plaintiff for employment, he stated that his mother was very poor; that he could not make both ends meet by the wages he was receiving as driver of the truck, and that it would be a great charity on account of his mother to give him employment. His salary while bridge-man was fifty dollars per month; while gate-man, sixty dollars per month; and while ferry master, a portion of the time seventy-five dollars, and a portion of the time eighty-five dollars, per month. Soon after entering the employment of the plaintiff he, with his mother, began to live in better style, and to deposit money with considerable regularity in different savings banks, depositing in each year, after paying all his living expenses, more than his entire salary. The result was that, at the time of his discharge from the employment of the plaintiff, he had on deposit, in six different savings banks, all in his own name, excepting two, which were in the names of himself and his mother, about $30,000, and had invested in real estate in the city of Brooklyn $15,350. During all this time he had no other business, and no other apparent means of making or earning any money.

Where did this considerable fortune, accumulated with successive accretions during the year he was handling the moneys of the plaintiff, come from? There is some further evidence to show. A witness gave some evidence; tending to show that he stole five dollars from the drawer in the plaintiff's ferry-house in 1873. Another witness, who was

employed by the plaintiff to watch him, testified that in December, 1882, on three different occasions, he saw him at the close of his day's labor just before leaving the ferry-house, take bills from the money-drawer, and put them in his pocket, and then take the balance of the money and place it in the bag for return to the office of the plaintiff. Afterwards, on the 11th day of January, 1883, the treasurer of the company sent for him, and asked him to explain how he came by so much real estate, and whether he kept any savings bank book or account, and he stated that he had purchased the real estate with his savings, and that he never had any bank account or savings bank book, and made other false statements. Afterwards, on the 17th of January, when police officers attempted to arrest him upon a warrant charging him with crime against the plaintiff, he apparently attempted to run away from the officers, probably to get into his house before they could arrest him, and after his arrest, before he could get into his house, he offered to give the police officers $500 if they would let him go into his house for one minute. After his arrest he was searched, and there was found in one of his pockets four savings bank books, representing about $9,000 of deposits. It is a reasonable inference that he desired to get into his house to conceal the bank-books, so that they should not reveal his large deposits. After the discharge of Moore from the employment of the plaintiff, his successor in the office of ferry master returned to the company for the succeeding month much more toll money than Moore did for the corresponding period of the preceding year, although there was no apparent reason for a larger receipt of tolls. With all these facts pressing upon him and calling in question his integrity, Moore did not offer himself as a witness on his own behalf, although opportunity was offered him to be sworn and testify.

This evidence, so far as it tends to show a misappropriation by Moore of plaintiff's money, is mainly circumstantial. Some of the circumstances are not very strong, and stand-

ing alone, would be quite inconclusive and insufficient as the basis for any judgment. · But they all point in one direc‑ tion, and combined they furnish great probative force. They do not exclude every hypothesis but that of Moore's wrong-doing; but they all harmonize with that of his guilt. His innocence may be possible.   But courts, in weighing evidence and reaching conclusions, do not deal with possi‑ bilities, but with probabilities.   It may be that in reaching a conclusion adverse to Moore, a mistake has been made ; but mistakes cannot be eliminated from the administration of justice by human tribunals.   No more certainty in proof should be required than is ordinarily practicable.   In civil trials the party having the affirmative must make out his case by a preponderance of evidence.   The competent proof which would ordinarily satisfy a reasonable person should satisfy a court, and justify its judgment.   In this case it is not for us to determine how satisfactory plaintiff's evidence was, but whether there was any evidence to sustain the judgment.   That there was some, and sufficient, we have no doubt.   Moore received a large amount of money for the plaintiff—how much, cannot be shown with precision.   It called upon him to account for the money.   He rendered no account, and made no satisfactory statement.   He de‑ posited a portion of the money in plaintiff's office, and the evidence renders it highly probable that he deposited the balance in savings banks for his own use.   Its loss may be measured, to some extent, by his otherwise unaccountable gains.   The case against him is not one merely of suspicion but of great probability.

There is no rule of law which requires the plaintiff in a civil action, when a judgment against the defendant may establish his guilt of a crime, to prove his case with the same certainty which is required in criminal prosecutions. Nothing more is required in such cases than a just preponder‑ ance of evidence, always giving the defendant the benefit of the presumption of innocence.   Where a judgment for the

plaintiff involves crime or a moral turpitude on the part of the defendant, the court should always require satisfactory proof, and when that has been given judgment should follow regardless of consequences.   In no other way can the law be properly administered, and private rights effectually protected.    Moore, having occupied a confidential relation with the plaintiff, and received a large amount of money for it, of which it had no account and no precise knowledge, when called upon in reference to the money so received, should at least have been frank and truthful, and have given the best account he could.   His refusal to be sworn as a witness when confronted with plaintiff's evidence goes far under the circumstances of this case, to overthrow the presumption of innocence to which he would otherwise be entitled and which might solve a doubtful case in his favor.

We have thus far brought into view only the evidence given on the part of the plaintiff, and have yet to notice that relied on by the defendants.   Moore's account of his great accumulation of property is that a large share of it was given to him by his mother, and she is produced as a witness to prove it.   Her story is as follows :   She and her husband came to this country from Ireland in 1836, bringing with them 500 guineas.   It does not appear what was done with this money, and it is not claimed that it was ever deposited in bank or invested.   She kept boarders for about thirteen years, and during a portion of the same time a retail liquor store.   Her husband for several years bought and sold cattle and hogs, and butchered them, and in these kinds of business they made money, which was kept by her.   All these kinds of business terminated before 1853.   After that her husband, who sometimes indulged in too much drink, worked until his death, in 1856, in a distillery as a day laborer for twelve dollars per week.   What her children earned was brought to her and saved, although prior to 1856 it is certain from their ages that they could have earned but very little.   In 1856, when her husband died, she had accumu-

lated in this way $15,000, ten or twelve thousand of which was in bank bills and the balance in gold.

This money was all accumulated prior to 1854, and, as it was accumulated, was put and kept in a wooden .chest under or behind her bed. It does not appear that any member of her family knew that she had this money, and no other witness is produced who ·ever saw it or heard of it. She kept this large sum of money in that chest, unknown to any one,. until 1870. During all that time she lived in poverty, and she continued to do washing for other people until three years before the trial of this action, when she was seventy-six years old. She did not deposit the money in savings banks for fear she might lose it, although she lived near the Williamsburgh Savings Bank, and knew it was a very strong bank with an immense surplus. Although she was afraid to deposit the money in banks, she kept the bank-bills— most of them for twenty years—in a frail wooden box, through the financial crisis of 1857, and until long after such bills had gone out of circulation and been supplanted by the national currency, and the state banks had ceased to do business. She kept the gold notwithstanding the enormous premiums which it had reached until the premium had been mostly swept away. While she distrusted the banks for her own money, she was careful to deposit the money earned by her son before he entered the employment of the plaintiff, from time to time as he earned it, in a savings bank. Although she kept this money so long—some of it certainly thirty years—in 1870 she began to dole it out to her son, at first in small sums, and then in larger sums, until she had given all of it to him. She suddenly, in 1870 acquired confidence in banks and in her son, and began to dispose of the hoarding of many years, and still took in washing to earn money. It is also a singular coincidence that she began to swell her son's bank account at the same time when the complaint charges that he began to embezzle the moneys of the plaintiff.

Such is her story, uncorroborated in a single essential particular. It is against common experience and observation. It is possible that it is true, but it is highly improbable. It is extraordinary and incredible, and certainly the trial court was not bound to believe it. While a court is bound to believe a disinterested, unimpeached, uncontradicted witness who gives evidence not in any way discredited, or in itself improbable or incredible, it is not bound to give credit to a witness who is interested in the result of the action, and whose evidence is improbable, and discredited by circumstances, or is against common experience and observation. Here Mrs. Moore was interested, and it is enough for us to say that her evidence was of such a character that no court was bound in law to believe it, and the case is thus left to stand upon the plaintiff's evidence.

We see no reason to believe that the trial court committed any error to the prejudice of the defendants, in the amount awarded to the plaintiff. We are, therefore, of opinion that the order of the general term should be reversed, and the judgment of the special term affirmed, with costs.

All concur, except RAPALLO, J., absent.