PHILIP D. ARMOUR and Others, Respondents, *v.* DANIEL GAFFEY and JOHN T. GORMAN, Appellants.

30   121
s162a652
30   121
a165a630

*Duty of a consignee to keep accounts of sales made — effect of his willful destruction of his books — admission of fact made on a settlement.*

Under an arrangement by which meats are to be sold by a consignee at his own risk, at prices to be fixed by him, and the proceeds, less commissions, are to be remitted to the consignor, it is the duty of the former to keep books containing a correct account of the sales of meat consigned to him, and the credits and allowances to which the consignor is entitled, which should be subject to the inspection of the consignor; where an examiner, employed by the consignor, after a partial examination of such books by which he ascertained the prices received for sixty-seven carloads of the meats, has been refused further access to the books and they are afterwards willfully destroyed by the consignee, it is not improper to compute the amount due to the consignor for the meats whose selling price as recorded in the books had not been ascertained before their destruc-

tion, upon the basis of the sales of the sixty-seven carloads, and when the consignee concedes that the prices entered in the books were not the prices actually received for the meats sold, and that he had always conducted the business in the same way that he did in reference to the sixty-seven carloads, a shortage may be allowed for the meats, the account of the sales of which has not been examined, at the same rate as in the case of such sixty-seven carloads.

An admission of fact by a party is evidence against him, although made in a conversation had respecting a compromise of a controversy.

APPEAL by the defendants, Daniel Gaffey and another, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Albany on the 8th day of June, 1897, upon the report of a referee.

The defendants, from the 1st day of January, 1892, to the 1st day of June, 1895, sold meats for the plaintiffs on commission at Cohoes, Saratoga Springs and Glens Falls in the State of New York. Under the arrangement made the meats were to be sold by the defendants at their own risk at prices to be fixed by them and the proceeds thereof, less commissions, remitted to the plaintiffs.

The business during the period aforesaid was conducted in the following manner : " At the time of shipping each carload a draft was drawn by the plaintiffs upon the defendants for or near the estimated cost of the said meats in Chicago. That when said meats were sold the defendants made, for each separate carload, a separate statement, setting forth prices and sums at which each kind of meat was sold and the amounts of each kind of meat contained in such carload so sold; also the charges for freight paid by defendants, their commissions and such other deductions as might properly be made, and remitted the balance to the plaintiffs at Chicago. In cases where any balance remained, or if the charges and draft already paid exceeded the proceeds of the meat, the defendants received from the plaintiffs the amount due from them. " * * * Under this agreement and method of doing business 544 carloads of meat were sent by the plaintiffs and received by and sold by the defendants on commission during the period covered by this action, and the same number of returns or statements were made therefor by them to the plaintiffs as follows : 372 cars sent to Cohoes, 161 cars sent to Saratoga, and 11 cars sent to Glens Falls."

In May, 1895, the plaintiffs sent their auditing clerk, George M. Willetts, to examine the books of the defendant at Cohoes, Sara-

toga Springs and Glens Falls, and compare them with the returns made by the defendants, and he proceeded to make such examination. He examined the entries on the books showing the prices obtained by the defendants for forty-five carloads of meat sent to Cohoes, eleven sent to Saratoga Springs and eleven sent to Glens Falls, and compared the prices as thus shown with the prices which the defendants had reported in their statement sent to the plaintiffs.

By the books it appeared that the defendants received for the 45 carloads of meat sold at Cohoes, $605.29, for the said 11 carloads at Saratoga Springs, $119.31, and for the 11 carloads sold at Glens Falls, $162.02 more than they had reported or accounted for, amounting in all to $958.62 for the 67 carloads, as to which the accountant compared the books with the reports.

When the said Willetts had proceeded thus far with his examination, the defendants refused to allow him to have further access to their books, and soon after destroyed the same, with the exception of one ledger containing some of the last accounts, which, on the trial, they declined to produce, although its production was demanded by the plaintiff.

On the trial the witness George M. Willetts testified in reference to the explanation given by the defendant Gaffey for the discrepancies between the books and the statements sent to the plaintiffs, as follows: "Q. What reason did Gaffey give you, if any, for his returning to the plaintiffs a less price than his books showed? A. He stated that his reason was to reimburse himself for allowances made to customers; also for the excessive credit risks that he was obliged to take with his customers and charging them high prices for the goods, and claiming that he would return to Armour & Company what he claimed was a market value, and absorbed the balance to make up for his bad debts. Q. Did he tell you how long he had been doing this thing? A. He stated, in connection with this, that he had always followed this plan since he had been in business, and claimed that it was legitimate, and claimed that he felt that he had a right to return to Armour & Company what he claimed was a market value, irrespective of the selling price."

The witness Alfred R. Urion also testified as follows as to statements made by the defendant Gaffey: "He said that what Willetts had found as to accounting for a less price than obtained, that he

had always done it and considered it legitimate, and didn't propose to pay back that money. * * * He stated that he didn't think we had any right to go on with the examination of the books, and would not allow it. He said further, that if we expected by auditing his books to find that he had accounted for a less price than he received, he would say right here that he had done so, and that we need not look after that. He said his reason for doing that (after we questioned him) was that he was taking lightning chances in that town, and that we knew it was a hard town for creditors, and that he had bad debts, and that he accounted to us for what he believed was a fair market value."

Under the contract the defendants were to fix the prices at which they should sell the meats shipped to them by the plaintiffs, and the latter had no means of determining the actual price at which the defendants did sell, aside from the reports sent them by the defendants, except by their books. As above stated, the plaintiffs, by their agent, did examine the defendants' books as to the price received for 67 carloads, but as for the remaining 477, they were unable to make an examination in consequence of the destruction of the books by the defendants.

The referee found in favor of the plaintiffs for the difference between the amounts reported by the defendants as to the sales of the 67 carloads of meat, and the price at which such meats were actually sold, as appeared from their books; and, as to the remaining 477 carloads delivered to the defendants by the plaintiffs, the account of the sales of which, on the defendants' books, the plaintiffs' agent Willetts was unable to examine in consequence of the destruction thereof by defendants, he found a shortage at the same rate as the said books showed existed as to the said 67 loads, and from the judgment directed accordingly the defendants have appealed.

*John T. Norton* and *J. Newton Fiero*, for the appellants.

*George L. Stedman*, for the respondents.

PUTNAM, J.:

It was the duty of the defendants to keep books containing a correct account of the sales of meat consigned to them by the plain-

tiffs, and the credits and allowances to which they were entitled, which should be subject to the inspection of the plaintiffs. (*Keighler et al.* v. *Savage Mfg. Co.*, 12 Md. 383.) When the plaintiffs' agent commenced his investigation, it appears that they did have such books of account, but after Mr. Willetts had compared the amount received from the sales of sixty-seven carloads of meat, as shown by those books, with the reports, and had discovered a shortage of $958.62, they refused to allow him to have further access to the accounts, and shortly afterwards destroyed them.

No explanation whatever of this act, consistent with an honest and justifiable purpose, has been given. We are unable to find the slightest reason or excuse therefor. The willful destruction by them of their books authorized unfavorable inferences by the referee, and subjected the defendants "to a heavy burden of suspicion, as well as of proof." (1 Am. & Eng. Ency. of Law [2d ed.], 1089n.) The defendants were informed that the examiner was employed by the plaintiffs, not only to examine their books, but those of all their agents. No improper act or procedure on the part of the examiner was shown. The referee could come to no other conclusion than that the objection made by the defendant Gaffey to Mr. Willetts was a mere pretense to stop the investigation commenced by the latter, especially as the plaintiffs offered to obtain another examiner, if the defendants had any personal objection to Mr. Willetts.

The court below was justified in absolutely disregarding, disbelieving and discrediting the statement made by the defendant Gaffey in explanation of the difference between the defendants' books and the reports made of the sales of the sixty-seven carloads of meat, as to which the witness Willetts compared the books with the reports. We will not attempt to recapitulate the evidence, but it is difficult, after reading it, to come to any other conclusion than that reached by the referee. Under the contract the defendants were compelled to pay the plaintiffs the amount for which they sold the meat, not the market value thereof. They were not entitled to any allowance for "credit risks." They might be for allowances or deductions to customers on sales after they had made reports, but the testimony of the witness Willetts shows that, as far as he was allowed to examine the books, the claim of the defendant for such "reclamations" did not appear to be well founded; and as he was proceeding

to make a further examination as to the alleged "reclamations" the books were taken from him and destroyed. The well-settled principle, therefore, applied that "where it appears that a party has destroyed an instrument or document, the presumption arises that if it had been produced it would have been against his interest or in some essential particulars unfavorable to his claims under it. *Contra spoliatorem omnia presumuntur.* * * * The inference is that the purpose of the party in destroying it was fraudulent." ("*Joannes*" v. *Bennett*, 5 Allen, 169, 172.) The referee, under the circumstances, was justified in disbelieving the defendants' story as to the alleged "reclamations" and to determine that the defendants, on the sale of the sixty-seven carloads of meat, had wrongfully misappropriated the amount above stated.

It is clear that, under the evidence given, a claim was established in favor of the plaintiffs for the sum of $958.62 for money unlawfully retained by the defendants from the sales of the sixty-seven carloads of meat as to which the witness Willetts was permitted to compare their books with the statements previously furnished the plaintiffs

The question arises whether the referee was right in charging the defendants with the same rate of shortage on the 477 carloads of meat, as to which the plaintiffs' accountant was unable to compare the statements theretofore made with the books of the defendants.

Unless the finding of the referee in this regard can be sustained, the plaintiffs are remediless as to the said 477 loads, the only record of sales being contained in the destroyed books; and the evident purpose of the defendants in destroying them will succeed in its object.

As we have seen, the referee might well find, from the evidence and all the facts before him, that the defendant destroyed the books with no good or honest intent, but for the purpose of carrying out and effectuating a scheme to defraud the plaintiffs, commenced by the furnishing to the latter false statements of sales; and that the books were burned at the very time the plaintiffs were examining them with the intent to suppress evidence that the defendants knew would enable the plaintiffs to discover the amount of money they had misappropriated.

The defendant Gaffey in stating to the witness Willetts the reason

for returning a less sum to the plaintiffs than his book showed as to the sale of the sixty-seven carloads, said "that he had always fol-lowed this plan since he had been in business, and claimed that it was legitimate, and claimed that he felt that he had a right to return to Armour & Company what he claimed was a market value, irre-spective of the selling price." To another witness he said that "what Willetts had found as to accounting for a less price than obtained, that he had always done it and considered it legitimate, and didn't propose to pay back that money. * * * He said further, that if we expected by auditing his books to find that he had accounted for a less price than he received, he would say right here that he had done so, and that we need not look after that."

We find that in the manner in which the defendants had con-ducted the business there had ensued a loss to the plaintiffs, on sixty-seven carloads, of $958.62. The referee, as we have shown, being authorized to discredit the statement of the defendants as to "rec-lamations," was authorized to find that this shortage resulted from the defendants reporting to the plaintiffs, instead of the price at which they actually sold meat, what they called the "market value;" and as on the 67 loads this method of doing business resulted in a shortage of the amount above stated, and as the defendants admitted that they followed the same method of doing business as to the other 477 carloads of meat consigned to them by the plaintiffs — not reporting the price at which they had in fact dis-posed of the same, but what they called the market value thereof — we think the referee was authorized to reach the conclusion that the shortage on the 477 loads was at the same rate as on the 67 loads, as to which he was permitted to compare the books with the reports. If the defendants conducted the business with the plain-tiffs on the sale of the 477 loads in the same way as they did on the sale of the 67 loads, the referee could well find that the same result ensued — the same rate of shortage. There was a diffi-culty in determining the amount of the damage the plaintiffs were entitled to recover. It was difficult, however, because of the wrongful action of the defendant. If the books could have been produced on the trial, the exact state of accounts between the par-ties could have been ascertained without difficulty. It may be claimed that the method adopted to determine plaintiffs' damages

was somewhat speculative and uncertain; but, under the circum-stances, the court was not compelled to be exacting in regard to the evidence on which to base the plaintiffs' claim for damages.

There are authorities, where actions have been brought to recover anticipated profits in cases of breach of contract between partners or principals and agents, holding that past profits may be shown and considered as bearing on future profits. (*Bagley* v. *Smith*, 10 N. Y. 489; *Wakeman* v. *Wheeler & Wilson Mfg. Co.*, 101 id. 205.) In the case first cited it is said: " It is very true that there is great difficulty in making an accurate estimate of future profits even with the aid of knowing the amount of the past profits. This difficulty is inherent in the nature of the inquiry. We shall not lessen it by shut ting our eyes to the light which the previous transactions of the part-nership throw upon it. Nor are we the more inclined to refuse to make the inquiry, by reason of its difficulty, when we remember that it is the misconduct of the defendants which has rendered it neces-sary." In the opinion in *Wakeman* v. *Wheeler & Wilson Mfg. Co.* (*supra*), EARL, J., speaking of the damages in that class of cases, said: " They are nearly always involved in some uncertainty and contingency; usually they are to be worked out in the future, and they can be determined only approximately upon reasonable con-jectures and probable estimates." We see no reason to doubt that the referee, on the result of the examination made by the plaintiffs' accountant as to the sale of the sixty-seven carloads of meat and the defendants' admission that they had always accounted for a less price than they received, and had always conducted their business in the same way, had as good a basis for his finding as to damages as the several plaintiffs had in the authorities last cited.

We have been referred to the case of *New York & Brooklyn Ferry Co.* v. *Moore* (18 Abb. N. C. 106). The action was brought to recover a large sum, which, it was claimed, the defendant had embezzled. Substantially, the only evidence showing the defendant's liability was the amount of his bank account and other property he was shown to own. It appeared that when he entered the employ-ment of the defendant he was poor; that he always received small wages, and at the end of his service he had in savings banks $30,000 and real estate of the value of $15,000, and failed to account for the possession of this large amount of property. The trial court

considered the amount of property the defendant was shown to have possessed at the termination of his employment as a basis for computing damages, and its determination was sustained by the Court of Appeals, not only as to the fact of the misappropriation of the funds, but of the amount thereof. In his opinion Judge EARL remarked that the plaintiff "was able, however, to give evidence, which, we think, fully justified the findings of the Special Term and the judgment there given;" and, again, "We see no reason to believe that the trial court committed any error to the prejudice of the defendants in the amount awarded to the plaintiff." The amount embezzled by Moore, as appears by the statement of facts in the case cited, was as uncertain and indefinite as the amount appearing by the evidence in this case to have been appropriated by the defendants. In the case last referred to, Judge EARL remarked : "It may be that in reaching a conclusion adverse to Moore a mistake has been made. But mistakes cannot be eliminated from the administration of justice by human tribunals. No more certainty in proof should be required than is ordinarily practicable." The remark thus quoted from the opinion of the learned judge can well be applied to this case. The plaintiffs — the only record of sales being destroyed by the defendants — were compelled to rely upon the result of the examination by their accountant of sixty-seven of the five hundred and forty-four loads of meat delivered to the defendants, and the admissions of the latter that they had never accounted for meat delivered at the price at which they had sold it, and that they had always conducted their business in the same way they did in reference to the sixty-seven loads. This evidence was the best proof practicable under the circumstances, and, we think, sufficient to justify the finding of the referee. If the defendants have been injured, it is the result of their own wrongful act.

It is claimed that the referee erred in allowing evidence of the offer of the defendant Gaffey to compromise, made in Chicago. The conversation in question was had at an interview at which the plaintiff Armour was present, and must be considered by itself. It is held that no advantage can be taken of an offer made by way of a compromise; that a party may, with impunity, attempt to buy his peace. (*Tennant* v. *Dudley*, 144 N. Y. 504; *Smith* v. *Satterlee*,

130 id. 677.) But it has never been doubted that *an admission of fact* by a party is evidence against him, although made in a conversation respecting a compromise of a controversy. (*Marvin* v. *Richmond*, 3 Den. 58; *Bartlett* v. *Tarbox*, 1 Keyes, 495; *Murray* v. *Coster*, 4 Cow. 617, 635.) In the conversation referred to at Chicago, at which the plaintiff Armour was present, the defendant Gaffey made no denial of his indebtedness in the amount of the shortage found to exist by Mr. Willetts' examination of his books. He at that time said that he was willing to reimburse the plaintiffs *for the amount which Mr. Willetts, the auditor, had found.* The referee could properly receive this statement as an admission of the amount thus found due by the auditor; and in this view of the case we think no error was committed in receiving the testimony referred to.

We conclude that the judgment should be affirmed, with costs.

All concurred.

Judgment affirmed, with costs.