LEOPOLD ZIMMERMANN and Others, Copartners, Doing Business under the Firm Name of ZIMMERMANN & FORSHAY, Appellants, *v.* THE ROESSLER & HASSLACHER CHEMICAL COMPANY, Respondent.

First Department, December 30, 1935.

*Harold Nathan* of counsel [*Frederick F. Greenman* and *Chester Rohrlich* with him on the brief; *Cook, Nathan, Lehman & Greenman*, attorneys], for the appellants.

*Charles L. Woody* of counsel [*James M. Gifford* and *Joshua D. Jones* with him on the brief; *Gifford, Woody, Carter & Hays*, attorneys], for the respondent.

UNTERMYER, J. The action is to recover damages for the breach by the defendant of a contract entered into on March 17, 1917, whereby it bought from the plaintiffs a cable or wireless credit of 3,000,000 German marks at a rate equivalent to 18.34⅜ cents per mark. It is undisputed that in July, 1919, when, as the plaintiffs contend, the breach occurred, the market value of the mark was 7¼ cents.

The plaintiffs were citizens and residents of the United States engaged in the foreign exchange business in New York city. The

defendant was a domestic corporation, doing business in the United States. On March 17, 1917, following conversations between representatives of the parties, the plaintiffs wrote to the defendant as follows:

" We beg to confirm our understanding of even date, in accordance with which we have sold to you (Three Million Marks)

                    Mks. 3,000,000.—

at the rate of (Seventy Three and Three Eighths) 73¾ for delivery during the month of October 1917.

" It is understood that the Marks are to be paid for here and abroad not later than October 31st, 1917, and in case wireless should be interrupted by that time, payments are due here and abroad upon resumption of wireless.

" Kindly confirm this understanding to us and oblige."

The defendant replied on the same date confirming in substantially identical terms the understanding set forth in the plaintiffs' letter.

· The present action is upon an amended complaint containing four causes of action, all of which seek damages, though upon different theories, resulting from the defendant's failure to perform the contract evidenced by the letter of March 17, 1917. The original complaint had alleged that the plaintiffs and the defendant entered into an agreement as set forth in the letter of March 17, 1917, and alleged a breach in that wireless communication was interrupted prior to October, 1917, and was re-established on July 22, 1919, at which time the plaintiffs demanded performance but the defendant refused to perform the contract.

The question came before the courts as one of pleading and it was held that no cause of action was stated in the complaint. The Court of Appeals held (240 N. Y. 501) that whatever else the parties intended, they apparently did not, on March 17, 1917, intend a present sale of marks in New York city with immediate passing of title thereto, delivery and payment to be postponed. It was said that probably the parties intended the establishment of a foreign credit for the benefit of the defendant, but that in the absence of any allegation concerning the technical meaning of the terms in which the contract was expressed, or of custom or usage, the court could not assume to rewrite the contract as pleaded and insert terms which the parties had omitted. The plaintiffs then served an amended complaint pursuant to leave granted by the Court of Appeals on a motion to amend the remittitur (241 N. Y. 512).

Thereafter, upon consent of the parties, an order was made and entered on March 22, 1927, referring the issues of law and of fact to a referee to hear and determine. It was established before the

referee by the uncontradicted testimony of the plaintiffs' witnesses, in many respects corroborated by testimony of the defendant's officers given on an examination of the defendant before trial, that the agreement between the parties, evidenced by the letters of March 17, 1917, was one by which the plaintiffs agreed to create by wireless a credit of 3,000,000 German marks on such day in October, 1917, at such place in Germany and in favor of such person, firm or corporation as the defendant should theretofore have instructed the plaintiffs, provided the defendant had first paid to the plaintiffs the purchase price stipulated in the contract. There was no substantial dispute as to what had occurred in the conversations which preceded the exchange of the letters of March seventeenth. The few discrepancies in the testimony are of trifling significance and are readily accounted for by the lapse of time between the dates of the occurrences and the date of the trial. Indeed, the defendant called no witnesses at the trial but relied wholly on the cross-examination of the plaintiffs' witnesses and on the testimony of the defendant's officers given upon the examination of the defendant before trial.

The referee rendered an able and painstaking opinion and report. In accordance with the uncontradicted proof he found that the parties had not intended a purchase and sale of marks in currency and that " plaintiffs were not required either to have the marks available or to create the credit before the receipt of the purchase price and the instructions from the defendant with respect to the time when, the place where and the person in whose favor the credit was to be established in Germany." Accordingly he held that since the defendant failed to pay or tender the price and never gave the plaintiffs the necessary instructions with respect to the time, place and name in which the credit was to be made available, it " has breached the contract, unless it be held that the contract was not merely suspended, but abrogated and dissolved, by the war between the United States and the Imperial German Government which was declared on April 6, 1917, and which continued and made wireless and cable communication with Germany illegal and impossible from early in April, 1917, until about the middle of July, 1919." Answering that question, the referee held that the provision of the contract, " It is understood that the Marks are to be paid for here and abroad not later than October 31st, 1917, and in case wireless should be interrupted by that time, payments are due here and abroad upon resumption of wireless," had relation to such a temporary interruption of wireless service as might occur in the natural course of events but that it did not include an interruption of wireless communication resulting from the war.

It is only upon this issue that we differ from the conclusions of the referee, but since that issue is decisive of the case it requires the reversal of the judgment and the direction of judgment in favor of the plaintiffs for the amount demanded in the complaint.

In considering the meaning to be ascribed to the provision of the contract that " in case wireless should be interrupted by that time [October 31, 1917], payments are due here and abroad upon resumption of wireless," we must place ourselves in the position of the parties in March, 1917, when the contract was made. (*Swinnerton* v. *Columbian Insurance Co.*, 37 N. Y. 174.) On January 31, 1917, the German government had announced its policy of unrestricted submarine warfare. Diplomatic relations between the United States and Germany were severed on February 3, 1917, and a note of dismissal was handed to the German Ambassador. The Governor of the State of New York, at the request of the mayor of New York city, ordered out the National Guard and Naval Militia to assist the municipal authorities in the maintenance of law and order. On February 28, 1917, the Associated Press published, with the consent of the government, a decoded message sent by an under secretary of the German ministry to Alfred Zimmermann, the German Minister to Mexico, proposing, in the event of war with the United States, an alliance with Mexico under which she would recover the territory lost in Texas, New Mexico and Arizona. In the early part of March, 1917, American ships were sunk by German submarines and on March ninth the President issued a proclamation calling Congress to convene in special session on April sixteenth. On the same day the President ordered the arming of American merchant ships. During the week of March 9, 1917, an American ship was sunk by a German submarine. During the week ending March 17, 1917, three American ships were sunk by German submarines and the President advanced the date of the special session of Congress to April 2, 1917. The existence of a state of war was recognized by Congress on April 6, 1917, three weeks after the contract under consideration in the present case was made. " It is against such a background that we must view the facts." ( *United States* v. *Brown*, 247 N. Y. 211.)

All the parties who participated in the negotiations resulting in the letters of March 17, 1917, could not fail to be familiar with these historical events. They must have realized at that time that war, though perhaps not a certainty, was almost inevitable. Realizing this it would not be unreasonable to suppose that they provided against a contingency which it was necessary to reckon with. We find that supposition to be in accordance with the facts. The assistant manager of the plaintiffs' foreign department, called

by the plaintiffs, testified to a conversation with the defendant's treasurer in March, 1917, concerning the sale of marks for fall delivery and that " I pointed out to him that we were at the brink of war." He testified that when closing the contract on March seventeenth he expressly stipulated that " in case of war for delivery after the cessation of hostilities and upon the resumption of wireless service." The plaintiffs' representative in charge of their foreign exchange department also testified that in conversations with the defendant's treasurer in March, 1917, in relation to " a transfer to Germany for later delivery of exchange " they discussed " the possibility and probability of a war between the two countries," that war was " in the air " and that " delivery could only be made and a contract could only be entered into if it was expressly understood that payment here and abroad could be made after resumption of wireless." The representatives of the defendant who participated in these conversations admitted rather than denied that impending war was the subject of discussion. Indeed, the defendant's treasurer conceded that " we might have just touched on it; I don't know," and that " some proposals were made as to what would happen as to any arrangement which you [we] were then discussing in the event that war intervened."

The writings which evidence the contract here are in no sense inconsistent with the conversations which preceded, and even though they do not in terms refer to war we are of opinion that they refer to its equivalent. It was undisputed that at this time wireless was the only form of telegraphic communication with Germany. It was recognized also that war would necessarily result in a suspension of wireless service and, of course, that at the conclusion of war wireless service would be resumed. · In point of fact the same day that Congress recognized the existence of a state of war with Germany the Navy department took over all radio stations and notified all private telegraph companies that service to Germany was closed. Both as a matter of law and as a matter of fact performance in October, 1917, was illegal and impossible and none was attempted. These conditions prevailed until the middle of July, 1919, at which time it again became possible to send cable messages to Germany, and thereupon on July 22, 1919, the plaintiffs wrote to the defendant offering to transmit a credit of 3,000,000 marks and demanding instructions in connection therewith. Therefore, if we apply literally the language of the letters of March seventeenth to the undisputed facts, it is evident that the plaintiffs' duty to deliver and the defendant's duty to accept the credit was postponed until the resumption of wireless communication in July, 1919. It is only by excluding the contingency of war from the

comprehensive language used by both parties that we would at all be justified in saying that the parties did not include that contingency in their calculations. (*Neumond* v. *Farmers Feed· Co.*, 244 N. Y. 202.) The question is not whether a contract for the sale of such a credit would ordinarily be terminated by war but whether it was intended by the contract of the parties that the time for performance, in the event of war, should be extended until the resumption of wireless communication between the United States and Germany. In other words, in the light of the situation as I have depicted it, what did the parties mean when they said, " in case wireless should be interrupted by that time [October 31, 1917], payments are due here and abroad upon resumption of wireless? "

There is nothing in the use of the word " interrupted " to preclude an interruption for the duration of a war. In its primary significance the word refers to a complete cessation, though the text may indicate that it includes imperfect service. (*Atlanta Standard Tel. Co.* v. *Porter*, 117 Ga. 124; 43 S. E. 441.) The provision is not the language commonly used with reference to temporary delays in wireless transmission arising from natural causes. This is obvious by comparison with three previous written confirmations between these parties for the sale and purchase of marks. In two instances they contain a provision that the plaintiffs are not " responsible for delayed payment or non-payment of the above amount caused by any delay or error on the part of the Cable Co. in the transmission or the delivery of the message." The third contains a provision that " in making a cable transfer it is fully understood and agreed that no liability shall attach to us nor to our correspondents for any loss or damage in consequence of any delay or mistake in transmitting the message." Compare also the similar form of contract under consideration in *Gravenhorst* v. *Zimmerman* (236 N. Y. 22, 28, 29). Furthermore, the provision of the contract here concerning interruption of wireless " *by that time* "— October 31, 1917 — is not language to suggest a temporary delay in wireless communication. It refers with great precision to the last day on which the transfer was required to be made and provides against a contingency which might have intervened " by that time." The failure of the parties to refer to war as such is not conclusive, because concededly they knew that suspension of wireless service would be concurrent with war and they may fairly be assumed to have known that wireless service and trade with Germany would be resumed shortly before or shortly after a formal proclamation of peace — as did in fact occur.

It is not decisive that the parties did not enter upon the transaction as a speculation, if such be the fact. It must be remembered that at that time the consequences of war upon the currency of the participants was not known, as it is at present known. The history of previous wars had not established that the currency of a defeated nation was rendered worthless. If either party at that time had consulted the teachings of history, the indications were entirely to the contrary. (Currency and Credit, by R. G. Hawtrey, p. 233; Conant, History of Modern Banks of Issue, 1918, pp. 54, 55, 269–271; Seligman, Currency Inflation and Public Debts, 1921, pp. 24, 33, 34, 82.) Such consequences would surely not have been suggested by the fact that on the date of contract the German mark was selling in our markets at over eighteen cents, notwithstanding the imminence of war.

The defendant insists that by comparison with a previous letter written by the plaintiffs to the defendant, dated March 10, 1917, the letters of March 17, 1917, are shown not to have contemplated the event of war. The plaintiffs' letter of March tenth offered a contract for 2,000,000 marks deliverable until April 30, 1917, and provided that " in case the United States should be in a state of war with Germany the marks would be deliverable after the re-establishment of normal conditions, and you, of course, would have to pay us when we delivered these marks to you." Although the defendant's treasurer, now its president, testified that " those were the particular conditions we objected to," there is no suggestion in the record that such an objection was ever communicated to the plaintiffs. On the contrary, the defendant's present treasurer, who represented the defendant in these negotiations, testified that the reason the proposal contained in that letter was not accepted was because " we were not interested in that [April] delivery. I told him we wanted September delivery or Fall delivery." Elsewhere he testified that the proposal of March tenth was not accepted because "April delivery was of no interest to us." In view of this testimony, we would be justified in drawing the inference that no objection to the provision contained in the letter of March tenth was ever communicated by the defendant to the plaintiffs because it reflected their common understanding and that the subsequent letters of March 17, 1917, were intended to express the same general thought in more accurate terms — more accurate because " resumption of wireless " was more specific than " re-establishment of normal conditions."

Whatever doubt may exist concerning the intentions of the parties is dispelled, we think, by their subsequent correspondence. Following the letters of March 17, 1917, no communication seems

to have passed between them until October 30, 1918. On that date the defendant wrote to the plaintiffs, referring to the letters of March seventeenth, and stating: "We wrote you in answer confirming our understanding and stating that it was understood that the marks were to be paid for here and abroad not later than October 31, 1917, and in case wireless should be interrupted by that time, payments were to be due here and abroad upon resumption of wireless. The purpose and object which we had in view was to protect our company against certain conditions which might arise. The reason, however, for the purchase no longer exists and we would like to learn from you what disposition you would like to make of the transaction. Awaiting your early reply, we are." It is significant that although the defendant's letter included an exact summary of the contract, no claim was made that it had been abrogated by the outbreak of war. On the contrary, the letter clearly recognized the continued existence of the contract and requested information concerning the disposition which the plaintiffs desired to make of the transaction.

To this letter the plaintiffs replied: "Under present conditions we do not see our way clear to enter into any agreement that deviates from the one already existing between us."

Following this reply, the defendant on November 25, 1918, wrote that it had submitted the matter to its counsel and inclosed a copy of its counsel's letter in which the position was taken that the plaintiffs were required to deliver the marks during October, 1917. But neither the opinion of counsel nor the letter of transmittal contained any suggestion that the contract had been abrogated by the war. On December fourth the plaintiffs replied to the defendant's letter insisting that the "contract is binding on us and we intend to live up to it." To that letter the defendants made no reply.

On July 22, 1919, cable transmission to Germany having been resumed, the plaintiffs wrote to the defendant as follows: "Inasmuch as cable messages can now be transmitted to Germany, we beg to advise you that we are prepared to carry out our contract of sale to you of Mks. 3,000,000, as per contract entered into between us on March 17, 1917. Please send us your check for $550,312.50 with your instructions as to whom the Mks. are to be paid." The defendant replied on the day following, stating in part: "We are not in position to utilize marks and we, therefore, would prefer to be released from our obligation and ask you to advise us what settlement you will be prepared to offer." On July 30, 1919, the defendant again wrote to the plaintiffs as follows: "With reference to our letter of July 23rd regarding our contract

covering Mks. 3,000,000 — of March 17, 1917, we will say that without a definite reply from you, we are prepared to pay the amount of $50,000 — in order to secure a release from the above contract, the fact remaining that we are not in position to utilize the amount of marks covered by the contract."

The referee declined to attribute significance to this correspondence " because if, as a matter of law, the contract was abrogated by the war, the defendant's mistaken admission of the survival of the contract would make no difference." It is true, of course, that the defendant's admissions are not conclusive upon the question of the scope of the contract. But in determining the significance to be attributed to the language of the parties recourse may be had to the best of evidence — the defendant's own admissions as to what the parties had intended. For that reason we are of opinion that the correspondence is entitled to consideration and weight as indicative of the defendant's interpretation of its own contract. " The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court, and to this end not only the acts but the declarations of the parties may be considered." (2 Williston Cont. § 623.) Such is the well-established rule. (*Woolsey* v. *Funke*, 121 N. Y. 87; *Nicoll* v. *Sands*, 131 id. 19; *Carthage T. P. Mills* v. *Village of Carthage*, 200 id. 1; *Clark* v. *Carolina & Y. R. R. Co.*, 225 id. 589.) So considered, the correspondence indisputably shows that the defendant in 1918 and 1919 did not consider and, therefore, on March 17, 1917, could not have intended, that the contract would be abrogated by war. Although we may not consider the defendant's offer of compromise as an admission of liability (*Tennant* v. *Dudley*, 144 N. Y. 504; *Smith* v. *Satterlee*, 130 id. 677), we may consider any statement of fact which it contains. (*White* v. *Old Dominion S. S. Co.*, 102 N. Y. 660; *McElwee Mfg. Co.* v. *Trowbridge*, 68 Hun, 28; affd., 142 N. Y. 679; *Armour* v. *Gaffey*, 30 App. Div. 121; affd., on opinion below, 165 N. Y. 630.) As such, the defendant's letters are eloquent admissions of the fact that the contract was intended to survive the war, because after the outbreak of war it referred to that contract as a subsisting obligation. It never suggested the war as a reason for non-performance, but merely stated that it was not in a position " to utilize marks." (Compare *Luckenbach S. S. Co., Inc.,* v. *Grace & Co., Inc.*, 267 Fed. 676; certiorari denied, 254 U. S. 644.)

Giving due consideration, therefore, to the situation of the parties when the contract was made, to the conversations which preceded and to the correspondence which followed and in particular to the language in which the contract is expressed, we are .

of opinion that the provision relating to suspension and resumption of wireless communication was intended to be synonymous with war. If so, then the plaintiffs are entitled to recover the difference between the contract price of marks, equivalent to 18.34⅜ cents per mark, and the market price of seven and one-quarter cents at the time stipulated for delivery. Concededly that difference amounts to $332,812.50, for which the plaintiffs are entitled to judgment, with interest from July 22, 1919.

The judgment should be reversed, with costs, and judgment directed in favor of the plaintiffs against the defendant for the sum of $332,812.50, with interest from July 22, 1919, and costs.

MARTIN, P. J., MERRELL and TOWNLEY, JJ., concur; GLENNON, J., dissents and votes for affirmance on the opinion of the referee.

The following is the opinion of SAMUEL SEABURY, referee, rendered on October 18, 1934:

SEABURY, Referee. This action was commenced October 31, 1923. The original complaint alleged in substance that on March 17, 1917, the plaintiffs and defendant entered into an agreement reading as follows:

"THE ROESSLER & HASSLACHER CHEMICAL COMPANY

100 William Street

"NEW YORK, *Mar.* 17, 1917

"Messrs. ZIMMERMANN & FORSHAY

9 & 11 Wall St.,

New York.

"DEAR SIRS: We are in receipt of your favor of even date and herewith confirm our understanding in accordance with which we have bought from you Mks. 3,000,000.— (Three Million) at the rate of 73⅜ for delivery during the month of October, 1917. It is understood that the Marks are to be paid for here and abroad not later than October 31st, 1917, and in case wireless should be interrupted by that time, payments are due here and abroad upon resumption of wireless.

"Yours very truly,

"THE ROESSLER & HASSLACHER CHEMICAL CO.

' [Signed] WM. A. HAMANN, *Treasurer.*

"WAH:W "

The original complaint further alleged that wireless communication between the United States and Germany was interrupted subsequent to March 17, 1917, and prior to October, 1917, but was re-established on or about July 22, 1919, and that thereupon

plaintiffs notified defendant that they were ready and willing to carry out the contract and demanded the purchase price of the marks, but that defendant refused to carry out the contract or to make said payment, although plaintiffs remained ready and willing to carry out the contract. Judgment was demanded for the purchase price.

On a motion made by plaintiffs to strike out the special defenses contained in defendant's answer, defendant attacked the sufficiency of the complaint. The motion came on to be heard before Mr. Justice FORD, who dismissed the complaint with an opinion in which he held: " The contract in question, fairly construed, contemplated the purchase in Germany of German marks and payment for them in New York, probably to establish credit in the foreign country. The words ' payments are due here and abroad ' presuppose payment in money here and the delivery of German marks abroad. It would be a forced construction of the contract to hold that it contemplated the purchase of marks anywhere else for delivery in New York."

The use of the word " payments " as applicable alike to the delivery of the marks abroad and the payment of money here, Mr. Justice FORD regarded as natural, " since in popular speech no distinction is made between foreign and domestic money." For the purposes of the action, however, Mr. Justice FORD held that the mark must be regarded as a commodity and that the word " payments," so far as it applies to marks, must be held to mean " delivery." Mr. Justice FORD concluded that the contract was one for the purchase and sale of commodities to be performed partially in Germany and partially in this country and that the cause of action falls under the Sales Act. He also held that inasmuch as the complaint was based on a contract made before the war and sought to be continued through its existence and enforced after the return of peace, it should contain sufficient allegations to show why the contract does not fall within the condemnation of the " Trading with the Enemy Act," of which the courts must take judicial cognizance as they would of the state of war existing between the United States and Germany during the alleged continuance of the contract.

Mr. Justice FORD gave the plaintiffs leave to plead over.

Plaintiffs appealed from Mr. Justice FORD's order to the Appellate Division and a stipulation was executed extending plaintiffs' time to serve the amended complaint until twenty days after the service of a copy of the order to be entered on plaintiffs' appeal.

The Appellate Division unanimously affirmed the order in an opinion by Mr. Justice FINCH. The Appellate Division said

(211 App. Div. 321, 323): " It is not possible to construe the contract in the case at bar to be other than a contract for the purchase and sale of marks. If it had been a contract for the sale of credit, some time and place would have been specified for the establishment of such credit. As far as the contract goes, such credit might be established in one place as well as in another and this shows more clearly than anything else that the contract is not a sale of credit but is just what it expresses upon its face, namely, a sale of 3,000,000 marks at a specified rate ' for delivery during the month of October, 1917.' "

The court thereupon held that the contract was one for the sale of goods within the meaning of the Personal Property Law; that time of delivery was October, 1917, and since no place of delivery is fixed by the terms of the contract and no usage to the contrary was shown, the place of delivery under the Personal Property Law would be the seller's place of business, if he had one, and if not, his residence. The court held further that the time of payment is subject to delay by interruption of wireless, saying (p. 324): " The appellants wish us to insert the words ' and delivered,' or words of similar import, in the second sentence requiring the marks to be paid for and delivered not later than October 31, 1917, and in case wireless should be interrupted, then to have *delivery* and payment postponed." (Italics by the court.)

To insert said words, said the Appellate Division, would be to change the express words of the contract and make a contract which is now plain as to delivery, ambiguous, and, in effect, to make a new contract for the parties which would bear very harshly and unconscionably on the defendant. The court concluded: " The plaintiffs, not having alleged in their complaint that they had duly performed their obligations under the contract by delivering the marks during the month of October, 1917, do not make out a cause of action in accordance with the terms of the contract, and hence the order appealed from dismissing the complaint of the plaintiffs should be affirmed, with ten dollars costs and disbursements."

Judgment dismissing the complaint was entered on the order of the Appellate Division. Plaintiffs then appealed, by permission, to the Court of Appeals. The following question was certified: " Does the complaint herein state facts sufficient to constitute a cause of action? " The Court of Appeals affirmed the judgment and answered the question in the negative (240 N. Y. 501). Judge ANDREWS said (p. 505):

" Whatever else the parties had in mind, clearly they did not on March 17th contemplate a present sale of marks in New York, with the immediate passing of title thereto, delivery and payment to be postponed.

" It is far less difficult, however, to determine what the parties did not mean by this contract than to decide what they did, if indeed they ever reached any common understanding."

If the contract were for the purchase and sale of marks, Judge ANDREWS said, there were two reasons why plaintiffs could not recover, to wit: *First*, for plaintiffs' failure to tender performance by October thirty-first, " only the payment being then postponed by the interruption of wireless;" and *second*, the action being for price could not succeed because no title passed to the purchaser. Judge ANDREWS continued (p. 505): " Probably, however, the parties had in mind the establishment by wireless of a foreign credit for the benefit of the defendant."

Judge ANDREWS stated that he thought the words " paid for here and abroad " and " payments are due here and abroad " might show such an intent; that the phrases might have acquired a definite meaning by custom and usage. He said also that the reference to an interruption of wireless " strengthens this possibility." " Even so," continued Judge ANDREWS, " what definite agreement has been made? " Judge ANDREWS pointed out that the country where the credit is to be established is not named; that since the letter speaks of marks, perhaps Germany was intended, but if so, neither the city nor the bank is named. There may be a custom, Judge ANDREWS pointed out, that German credits were to be made available at the Reichsbank in Berlin and by it transferred to a branch in any city in Germany on request. Judge ANDREWS pointed out that it did not appear on what day in October the credit was to be made available or whether there was a custom that this was to be at the buyer's or at the seller's option. Judge ANDREWS said: " In the absence of any allegation as to the technical meaning of the terms employed, of any custom or usage giving force to such a contract as the one before us, we cannot attempt to rewrite it, and insert necessary terms which the parties have omitted " (p. 506).

Even if the contract was not terminated but merely suspended by the war, notwithstanding the resulting depreciation in the value of the mark, one thing at least is clear, said Judge ANDREWS: " The establishment of the credit in Germany and payment therefor in New York could not be concurrent acts. The language used indicates that the former was to precede the latter. If so, notification that the plaintiffs were ready and willing to carry out the contract, coupled with a demand for the immediate payment of $550,322.50 was rightly refused. There was no proper tender of performance. There was no anticipatory breach of the contract by the defendant."

In the meantime plaintiffs' time to amend, pursuant to the stipulation which had been made pending the appeal to the Appellate

Division, had expired and neither the Appellate Division nor the Court of Appeals had granted plaintiffs leave to amend. Plaintiffs thereupon moved in the Court of Appeals for an order requesting the Supreme Court to return the remittitur to the Court of Appeals and that the remittitur when returned be amended so as to grant leave to the plaintiffs to serve an amended complaint. The motion was granted by the Court of Appeals (241 N. Y. 512) and, pursuant to such leave, the plaintiffs thereupon served an amended complaint.

In the amended complaint there are four alleged causes of action. The first cause of action alleges the contract according to plaintiffs' interpretation of the legal effect of the letters exchanged between the parties in the light of the customs affecting the transaction, to wit: that on or about March 17, 1917, the plaintiffs and the defendant entered into an agreement at the city of New York, whereby plaintiffs undertook and agreed during the month of October, 1917, to establish by wireless telegraphy a credit of 3,000,000 German marks at such bank in Germany and in favor of such person as the defendant should designate, in accordance with instructions to be given to the plaintiffs by the defendant, specifying the date during said month when, the bank in Germany at which, and the person in whose favor, said amount should be so credited; that said instructions were to be given within a reasonable time before the date so specified to enable the plaintiffs to establish such credit at such date; that by said agreement defendant undertook and agreed to give such instructions and to make payment in the city of New York at the time so specified in such instructions, in currency of the United States at the rate of 73⅔ cents for each four marks, amounting to $550,312.50 for 3,000,000 marks; it being understood, however, that if communication by wireless telegraphy between the United States and Germany should be interrupted or suspended by October 31, 1917, whether by conditions of war or otherwise, then such credit should be established by the plaintiffs by wireless telegraphy, in accordance with instructions to be given by the defendant as aforesaid, upon the resumption of communication between said countries, and the defendant should pay therefor at the said rate and at the time and place specified as aforesaid. It is then alleged in the first cause of action that wireless telegraphy was interrupted and suspended prior to October 1, 1917, on account of war between the United States and Germany and remained interrupted and suspended continuously thereafter until on or about July 22, 1919, when communication between the two countries by wireless telegraphy was resumed. The first cause of action continues by alleging that upon said resumption of wireless communication and on or about

July 22, 1919, plaintiffs duly offered to perform the contract and to establish the credit by wireless telegraphy in favor of such person and at such bank in Germany as the defendant should designate and that plaintiffs asked the defendant for instructions with respect thereto, but that the defendant refused to give instructions and waived tender of performance by the plaintiffs and wholly failed and refused to perform the contract on its part, although plaintiffs were ready, able and willing to do so and so advised the defendant. It is then alleged that on or about July 22, 1919, the fair market value of the German mark was seven and one-quarter cents and by reason of the premises the plaintiffs were damaged in the sum of $332,812.50.

In the second cause of action the contract is alleged in the language of the writings, and the customs and usage applicable to the transaction are then alleged so as to give it the same legal effect as that alleged in the first cause of action.

In the third cause of action the agreement is alleged to be evidenced by an exchange of letters marked Exhibits "A" and " B " annexed to the amended complaint. These letters are (Exhibit A) a letter from plaintiffs to defendant dated March 17, 1917, reading as follows:

" NEW YORK, *March* 17, 1917.

" THE ROESSLER HASSLACHER CHEMICAL CO.,
   100 William Street,
     City.

" GENTLEMEN: We beg to confirm our understanding of even date, in accordance with which we have sold to you (Three Million Marks)
Mks. 3,000,000.—

at the rate of (Seventy Three and Three Eighths) 73⅜ for delivery during the month of October 1917.

" It is understood that the Marks are to be paid for here and abroad not later than October 31st, 1917, and in case wireless should be interrupted by that time, payments are due here and abroad upon resumption of wireless.

" Kindly confirm this understanding to us and oblige,

" Very truly yours,

" [Signed] ZIMMERMANN & FORSHAY

"D-M "

and (Exhibit B) the letter dated the same day from defendant to plaintiffs, of which a copy appears at the commencement of this opinion. The alleged customs and usages applicable to the transaction are then alleged so as to give the transaction the same legal

effect as that alleged in the first cause of action. The damages claimed in each of the second and third causes of action are the same as those claimed in the first.

The fourth cause of action alleges the contract according to the plaintiffs' interpretation of the legal effect thereof and then alleges that on the date of the making of the said alleged contract the plaintiffs, at the special request of the defendant, in order to assure defendant that plaintiffs would be able to fulfill their said agreement with the defendant, and to enable the plaintiffs so to do, entered into an agreement with Guaranty Trust Company of New York, whereby the trust company agreed, during the month of October, 1917, to establish by wireless telegraphy a credit of 3,000,000 marks at such bank in Germany and in favor of such person as the plaintiffs should designate in accordance with instructions to be given to the trust company by plaintiffs and that the plaintiffs agreed to pay the trust company at the rate of $73\frac{1}{16}$ cents for every four marks, amounting to $547,968.75 for 3,000,000 marks. This agreement between plaintiffs and the trust company is alleged to have contained provisions similar to those in the contract between plaintiffs and defendant respecting the effect of interruption or suspension of wireless telegraphy between the United States and Germany and the creation of, and payment for, the credit upon the resumption of such communication. It is then alleged that, by reason of defendant's failure to give instructions to plaintiffs under the contract between plaintiffs and defendant, the plaintiffs were unable to give the instructions required of them under their contract with the trust company and were obliged to breach their contract with the trust company, as a result of which plaintiffs became indebted to the trust company in the sum of " at least " $330,468.75 as and for damages sustained by the trust company by reason of plaintiffs' aforesaid breach of its contract with the trust company. It is then alleged that, by reason of the matters previously set forth, plaintiffs lost their profit in " the aforesaid transactions " amounting to the sum of $2,343.75 and were damaged in the sum of at least $332,812.50.

The amended complaint demands judgment for $332,812.50, with interest thereon from July 22, 1919.

The answer to the amended complaint, in addition to denials of the material allegations of the amended complaint, sets up eight defenses to each of the four causes of action. The first defense alleges impossibility of performance without violating the Trading with the Enemy Act and that the existence of a state of war between the United States and Germany had the effect of dissolving and abrogating the contract, if any existed. The second defense alleges

that plaintiffs failed and refused to deliver the marks during the month of October, 1917; that delivery or payment thereof by plaintiffs to the defendant were not subject to wireless interference and that plaintiffs did not purchase or have for or at the disposal of the defendant 3,000,000 marks. The third defense alleges, on information and belief, that if plaintiffs made any agreement with the Guaranty Trust Company, as alleged in the fourth cause of action, both the plaintiffs and the trust company, with the consent of the plaintiffs, have filed their claims in accordance with the laws and treaties affecting the United States and Germany asking compensation from Germany for said loss, and have elected to claim that the damages resulting from the non-performance of said contract were caused by the act of an enemy and that plaintiffs and their privies have elected to treat this contract, if any ever existed between plaintiffs and defendant, as nullified by the war; that plaintiffs have failed to protect the defendant by filing claims before the Mixed Claims Commission and are thereby estopped from claiming any liability or damages against the defendant. The fourth defense pleads the six-year Statute of Limitations. The fifth defense alleges a failure of consideration. The sixth defense pleads impossibility of performance because of the war between the United States and Germany. The seventh defense alleges that performance was rendered impossible by the Trading with the Enemy Act; that all marks on deposit or credits in Germany belonging to the plaintiffs or Guaranty Trust Company were officially seized and impounded in Germany and placed beyond the reach and control of either the plaintiffs or the trust company and delivery of the same thereby was made impossible during the entire period of the war; that, by treaties made during and since the war between the United States and Germany, said marks have been given a fixed and determined value equivalent to about sixteen cents per mark, and if plaintiffs or Guaranty Trust Company had any marks which they intended or were obligated to deliver to defendant, said marks remained on deposit and were of the value fixed by the said treaties, and that plaintiffs at no time ever tendered or offered to tender to the defendant any such marks or any such credit. The eighth defense pleads the Statute of Frauds, *i. e.*, that the agreement was for the sale of goods of a price of more than fifty dollars; that no written note or memorandum thereof was made in writing and subscribed by the defendant or its lawful agent; that the defendant received no part of the goods and paid no part of the price thereof.

War between the United States and the Imperial German Government was declared on April 6, 1917 — several months prior to the

time fixed for the creation of the credit — and all cable and wireless communication with Germany was interdicted by official governmental action, and so remained until about the middle of July, 1919. Promptly upon the reopening of cable communications with Germany, and on July 22, 1919, the plaintiffs wrote the defendant:

" GENTLEMEN: Inasmuch as cable messages can now be transmitted to Germany, we beg to advise you that we are prepared to carry out our contract of sale to you of Mks. 3,000,000 as per contract entered into between us on March 17, 1917.

" Please send us your check for $550,312.50 with your instructions as to whom the Mks. are to be paid.

" Yours very truly."

To this letter, the defendant replied on July 23, 1919, writing the plaintiffs:

" We have your favor of the 22nd inst. and note therefrom that you are prepared to carry out your contract of sale to us of Mks. 3,000,000 entered between us on March 17th, 1917.

" Our position is the same as it was some time ago. We are not in position to utilize Marks and we therefore would prefer to be released from our obligation and ask you to advise us what settlement you will be prepared to offer.

" Looking forward to your prompt reply, we remain,

" Yours very truly."

Defendant's reference in the foregoing letter to its position being " the same as it was some time ago " evidently refers to a statement contained in a letter written by defendant to plaintiffs on October 30, 1918, in which they referred to the exchange of letters constituting the contract, and continued: " The purpose and object which we had in view was to protect our company against certain conditions which might arise. The reason, however, for the purchase no longer exists and we would like to learn from you what disposition you would like to make of the transaction."

To this last-mentioned letter the plaintiffs had replied that " Under present conditions we do not see our way clear to enter into any agreement that deviates from the one already existing between us."

Plaintiffs did not reply to defendant's letter of July 23, 1919, and on July 30, 1919, defendant again wrote plaintiffs, this time saying: " We are prepared to pay the amount of $50,000 — in order to secure a release from the above contract, the fact remaining that we are not in position to utilize the amount of Marks covered by the contract."

The defendant argues that its letters should not be received in evidence because they were offers of compromise. I have received them, not as tending to establish that the contract survived the war, because if, as a matter of law, the contract was abrogated by the war, the defendant's mistaken admission of the survival of the contract would make no difference, or as an admission that plaintiffs had a valid claim against defendant in any amount. I receive the letters and consider them only as evidence of the independent facts which appear in them, particularly the fact that defendant did not give instructions to plaintiffs, either before or after the war, with respect to the time when, the place where, and the name in which, the credit was to be opened in Germany.

The proof adduced before me establishes that the contract here involved was one by which the plaintiffs agreed to establish, by cable or wireless, a credit of 3,000,000 German marks, available on such day in the month of October, 1917, in favor of such person, and at such place in Germany, as the defendant should theretofore have directed by notification to plaintiffs, provided the defendant first paid the plaintiffs the purchase price fixed by the contract for said marks and gave the necessary instructions.

This is the testimony of several witnesses well qualified to give evidence of the customs and practices in the foreign exchange business, and of this testimony I find no substantial contradiction. The witness Strauss testified that where an agreement such as this is made for the sale of foreign currency it means the transfer of a bank credit and not the delivery of the foreign money in currency. He said further: " The exact date of delivery is stipulated by the buyer of the foreign exchange, who is supposed to give instructions — * * *. When the time of the delivery arrives, the buyer of the exchange gives instructions to the seller of the exchange regarding the place where the payment of the foreign exchange is to take place, the city, and he also gives instructions naming the party to whom the foreign exchange credit is to be paid out." He testified further that the expression " payments are due here and abroad " is one in common use in the foreign exchange business, and " means that the buyer of the exchange will pay in dollars and by certified check, and upon receipt of the certified check the seller of the exchange will cable to his correspondent abroad to place to the credit of the party designated by the buyer the amount of exchange bought."

Another witness, DeWald, was asked to interpret the correspondence of March 17, 1917, and he said: " It meant the sale of a transfer of credit in Germany at a rate which was then figured at four marks to the respective amount of dollars. It also meant that the

purchaser had the right to give instructions to whom this credit was to be transferred in Germany at any date during the month of October. * * * It meant that the purchaser of the foreign exchange was to pay in this city in dollars, and upon the receipt of his payment a message would be sent either by wireless or any way to that respective country and payment ordered on the other side."

Similar testimony was given by the witness Dawson, a vice-president of the Guaranty Trust Company, who has been in the foreign exchange business for upwards of thirty years; Schmid, who has been in the foreign exchange business since at least 1902, and Burnes, who has been in the foreign exchange business for about twenty-five years.

From the nature of the contract it follows, *first*, that the contract was one for the sale of a credit to be established in the future, and, therefore, not for a sale of goods within the Statute of Frauds (*Equitable Trust Co.* v. *Keene*, 232 N. Y. 290); and, *second*, that plaintiffs were not required either to have the marks available or to create the credit before the receipt of the purchase price and the instructions from the defendant with respect to the time when, the place where, and the person in whose favor the credit was to be established in Germany. (*Fuller & Co., Inc.,* v. *Jordan, Jr., Inc.,* 196 App. Div. 114; *Sarachan & Rosenthal, Inc.,* v. *Wilson & Co.,* 207 id. 768; affd., 240 N. Y. 563; *Kent Co.* v. *Silberstein,* 200 App. Div. 52; 213 id. 855; affd., 241 N. Y. 440.)

Defendant contends that plaintiffs should have known where and when and in whose favor the credit was to be created, but I find no evidence to sustain this contention. The contention is based on the fact that there is evidence of two earlier transactions in which the defendant purchased cable transfers of marks from the plaintiffs and directed the plaintiffs to create the credit in favor of Deutsche Gold & Silber Scheide Anstalt, at Frankfurt a/Main. There is no claim that the plaintiffs knew defendant's purpose in purchasing the earlier credits or in purchasing the credit here involved and there would not have been the slightest reason for plaintiffs to assume that the credit here involved was to be created in favor of Deutsche Gold & Silber Scheide Anstalt. Moreover, even if the name and place in which the credit was to be created had been known by plaintiffs, they would still have been without information as to the date upon which defendant wished the credit to be erected. Again, even if plaintiffs had had this information as well, they were not obliged to create the credit until they were paid the purchase price.

The defendant did not pay or tender the price, and never gave plaintiffs the necessary instructions with respect to the time, place and name in which the credit was to be made available. Consequently, the defendant has breached the contract, unless it be held that the contract was not merely suspended, but abrogated and dissolved, by the war between the United States and the Imperial German government which was declared on April 6, 1917, and which continued and made wireless and cable communication with Germany illegal and impossible from early in April, 1917, until about the middle of July, 1919.

In the absence of provision in the contract to the contrary, or of language which, under the customs and usages of the foreign exchange business, must be otherwise construed, I should hold that an agreement between Americans here for the creation of a credit in marks in Germany " for delivery during the month of October, 1917," would not survive a war between the United States and the Imperial German government, declared in April, 1917, and making performance impossible until July, 1919. I should not, in the absence of language which was clear, attribute to the parties an intention to enter into such a wild speculation as would be involved in an agreement to pay, after the termination of the war, at pre-war prices, for the currency of a country with which we were about to go to war, which currency, if we succeeded in the war, would, in all probability, be rendered worthless, or practically so.

The question here is somewhat complicated, however, by the language which the parties have used. In the opening sentence of each of the letters which evidence this contract, the marks are referred to as " for delivery during the month of October, 1917," and it is then provided: " It is understood that the Marks are to be paid for here and abroad not later than October 31st, 1917." If the sentence ended there, it would be clear that the purchaser was required to pay for the marks here, and the seller was required to create the credit abroad, by not later than October 31, 1917. But the sentence does not end there — it continues: " and in case wireless should be interrupted by that time, payments are due here and abroad upon resumption of wireless."

It is contended by the defendant, the purchaser of the credit, that the word " payments " in the clause last quoted referred exclusively to the time of the payment here of the purchase price of the marks and that, irrespective of the interruption of wireless, the credit abroad had to be created by plaintiffs by October 31, 1917. The plaintiffs, the sellers, contend that under the customs and practices of the foreign exchange business, the establishment of a credit abroad is referred to as " payment " abroad and that

the phrase " payments are due here and abroad upon resumption of wireless " means that payment for the marks here and the creation of the credit abroad should take place upon resumption of wireless. In my opinion the plaintiffs', and not the defendant's construction is the proper one.

It is admitted by the defendant that this contract required defendant to make payment here in United States currency for the credit purchased, and that no payments were to be made by defendant to plaintiffs abroad. Consequently, it is clear that an interruption of wireless would not interfere with defendant's ability to make the payment that was due to be made here. The only feature of the transaction into which wireless entered, and which could be interfered with if wireless were interrupted, was the communication by the plaintiffs to their foreign correspondent of the instructions to be received from the defendant with respect to the time and place in Germany at which defendant wished the credit to be made available and the name of the person in whose favor the credit was to be established there. Moreover, the word used is " payments," not " payment," showing that more than one act was in contemplation. Yet there is no dispute that the purchase price was to be paid by defendant by a single remittance, and not in installments. Hence it is clear that the reference to the effect of the interruption of wireless on " payments * * * here and abroad " could not relate merely to the time of payment by defendant for the credit purchased. It had to relate also to the time of the creation of the credit abroad. This is consistent with the testimony of those in the foreign exchange business that the creation of the credit abroad is known as a " payment." The parties were careful to refer to payments " here and abroad " and effect can be given to both only by construing the clause to mean that in the event of the interruption of wireless, the time for payment by defendant here, and the time for the erection of the credit by plaintiffs abroad would be postponed until after the interruption. If the clause had provided merely that if wireless should be interrupted payment abroad would be due upon resumption of wireless, it might be argued that an extension of time for the creation of the credit abroad, resulting from the impossibility of sending wireless communications, would not automatically extend defendant's time to give the necessary instructions and pay for the marks here. The possibility of such a contention is obviated by the words which the parties have used. They have expressly provided that in the event that wireless is interrupted, " payments * * * here and abroad " shall await the resumption of wireless, thus making it clear that

if the plaintiffs' time to create the credit is extended by reason of the interruption of wireless, the time of the defendant to pay the plaintiffs for the credit is also extended. I, therefore, hold that the clause: "in case wireless should be interrupted by that time, payments are due here and abroad upon resumption of wireless," means that if wireless should be interrupted by October 31, 1917, and the credit had not already been created, the defendant's time to pay the plaintiffs and the plaintiffs' time to create the credit would be extended until the resumption of wireless.

The question remains, however: What did the parties intend by the word "interrupted?" Did they refer to a temporary interregnum, such as might occur in the natural course of events, or did they mean to include a complete termination of wireless communication due to war and to continue throughout the period of the war? In determining this question it is necessary to consider what the effect of delay would be upon the essential purposes of the parties in entering into the contract. Judge LEHMAN, in *Neumond* v. *Farmers Feed Co.* (244 N. Y. 202), put it clearly and succinctly when he said (p. 206): "If the contract is still executory at the beginning of the war, if there are mutual obligations that are yet to be fulfilled, the contract will be terminated when the essential purpose of the parties would be thwarted by delay, or the business efficacy or value of their bargain materially impaired."

In my opinion neither of the parties to this transaction entered into it as a speculation. The defendant was an old-established chemical importing concern which had occasion from time to time to make payments in Germany in marks; it was not entering into this transaction as a speculation. The plaintiffs promptly eliminated all possibility of speculation on their part by entering into a covering contract with Guaranty Trust Company by which the trust company undertook to create the credit at a price which left the plaintiffs a small profit on the transaction.

In determining whether the parties to this contract intended that the interruption of wireless by reason of our entry into the war should merely suspend the performance of the contract until after the determination of the war, it is a significant circumstance that the subject-matter of this contract is the currency of a country which, if we entered the war, would be an enemy — a country whose currency, if we were victorious in the war, might, and probably would, be rendered worthless. In such event the enforcement of the contract after the termination of the war would be unjust and inequitable. I do not think it is clear that the parties intended that the defendant should assume such a burden and in my opinion the inference that it did should not be drawn unless that infer-

ence is logically inescapable. Such is not the situation here. The provisions of the contract fall far short of indicating that the parties intended that the contract should be in force or capable of being revived in the event of the intervention of war. After providing that the marks were " to be paid for here and abroad not later than October 31st, 1917," it states merely that " in case wireless should be interrupted by that time [October 31, 1917] payments are due here and abroad upon resumption of wireless." The parties by this contract did not provide for the effect of interruption by war, but merely for the making of payments in the event that wireless should be interrupted and subsequently resumed. It is quite true that at the time the contract was made the relations between the United States and Germany were strained, perhaps almost to the breaking point, but the breaking point had not yet come and there were undoubtedly those who believed that it would be postponed or avoided. This condition might well have occasioned an interruption of wireless, even though actual conditions of war did not subsequently ensue. Certain it is that if wireless had been interrupted for a short period of time and then had been resumed without war having been declared, the contract would have become operative. It is not without significance that the contract says nothing about war being declared; yet, if the revival of the contract was intended to become effective after the intervention of war, it seems reasonable to suppose, particularly in view of the pending possibility of war, that the parties would have inserted some provision in the contract itself making express reference to the effect of the war. I do not think it would be a fair interpretation of the contract to hold that the parties contracted for the resumption of the contract after the termination of an intervening war, the length of which was indefinite, but which would in all probability be great if the United States became one of the belligerents and the effect of which would be, if the United States and its allies succeeded, to render the subject-matter of the contract worthless or nearly so. We are not required to draw an inference which would attribute to the parties a contract they have not expressed, which would materially increase the burdens assumed and the enforcement of which would work injustice.

My conclusion is corroborated by the evidence, which shows that throughout the negotiations the defendant made it clear to the plaintiffs that it was interested in a delivery at a particular time, to wit, during the month of October, 1917, and that it would not consider a proposition calling for a different delivery.

I, therefore, conclude that it was not the intention of the parties that plaintiffs might make delivery of the marks after the termination of the war, in the event the United States entered the war, and I find that this contract was terminated by the war.

The defendant is entitled to judgment.

Judgment reversed, with costs, and judgment directed in favor of the plaintiffs against the defendant for the sum of $332,812.50, with interest from July 22, 1919, and costs. Settle order on notice reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.