In the Matter of the Estate of LILLIAN ST. JOHN, Deceased.

Surrogate's Court, Kings County, May 19, 1937.

*Belfer & Belfer*, for the petitioner Grace Rathbun, as administratrix, etc.

*G. W. & W. M. Winans*, for the respondent George Morgan.

WINGATE, S. This court had recent occasion (*Matter of Weinberg*, 162 Misc. 867) to comment upon the apparently increasing practice in certain classes of the community of attempting to subvert the rules of *Matter of Totten* (179 N. Y. 112, 125) to ulterior and anti-social ends. The facts disclosed on the hearing of the present discovery proceeding demonstrate the variety of situation which, next to that present in *Matter of Weinberg*, is probably the most common method by which the perpetration of fraud is attempted through the medium of the so-called savings bank "trusts."

In May, 1926, Phineas St. John was a man over eighty years of age who had been unemployed for upwards of four years. Some sixty years before, he had joined the Masonic fraternity and was a member of a local lodge. He applied to this lodge for relief and he and his wife were supported by it up to the time of his death which occurred approximately a year later. He was also buried at lodge expense.

On May 27, 1926, his widow, the present decedent, herself applied for Masonic relief. The questionnaire wh'ch she then completed, apparently in her own handwriting, represented that she was sixty-five years of age and unable on that account to secure any gainful employment. To the question, " What property have you, real or personal?" she replied, " Nothing but household effects;" and to that, " Have you any money on deposit in savings banks or elsewhere?" her answer was, " None."

As a part of the application, which was nominally for admission to the Masonic Home, was an agreement which she signed and which read in part as follows: " As a condition for admission to the Masonic Home, I hereby agree * * * to transfer to the Trustees of the Masonic Hall and Asylum Fund all property I may now be possessed of, and all which may hereafter come to me."

Attached to the application was a statement of the qualifications essential for an applicant, which included those that he or she must be " in destitute circumstances, unable to earn a living * * * and without relatives who by process of law can be compelled to contribute to his support," and the composite effect of the answers of the widow was to demonstrate that her situation complied with this description.

On the faith of these representations by the decedent, the local lodge and the Grand Lodge of the State of New York, through its agency, awarded her home relief, as had been done with her husband pursuant to an identical application form completed by him. In the interval between the date of the application and the time of her death, which occurred in the early part of this year, the total so paid her aggregated $4,460 exclusive of interest.

At the time of her death she held book No. 1013843 in the Dime Savings Bank of Brooklyn, issued in her name " in trust for George Morgan," who was a stranger in blood to her, which showed a credit balance of $2,338.70.

It is the sum represented by this account which, by means of the present proceeding, the administratrix is seeking to recover for the benefit of the Masonic lodge which the decedent had hoodwinked and defrauded and which for more than a decade had supported her on the faith of her representations of destitution.

Although transcripts of eleven savings bank accounts owned by the decedent at various times during her life, or in which she possessed an interest, were introduced in evidence, only seven of these possess potential relevance.

On May 27, 1926, at the time of the signature by the decedent of her application for relief, in which she made the representations of destitution and non-ownership of any property as a result of

which the subsequent payments were made to her, she had an account in the South Brooklyn Savings Bank numbered 327728, standing in her own name, which showed a balance of $670, and in which, on June seventh, although stating that she had no source of income, she deposited another $100. Further, on the same date she had account No. 760391 in the Dime Savings Bank, also standing in her own name, which showed a balance of $350. In other words, at the time of her representation of destitution, she had liquid cash assets of at least $1,020 and probably $1,120.

Apparently between this date and the following October twenty-fifth, some one informed her that these false representations might involve her in difficulties, since on the latter date she transferred the balance of the South Brooklyn account, which had grown to $1,178.66, into a new account in that institution, numbered 333096 in her name " in trust for Emma S. Rathbun." On the same day the Dime account, then increased to $356.58, was transferred into a new account, No. 772955, in her name " in trust for Florence E. Rathbun."

That her purpose in this regard was an effort to circumvent the agreement under which she had secured relief was demonstrated by the testimony on the hearing of Margaretta Donnelly in whose name as beneficiary a similar " trust " account was for a time carried in the Brevoort Savings Bank, and by Sarah Pidling, an intimate friend, to both of whom the decedent stated that she had signed a paper in order to secure relief, agreeing that any money she had should go to the Masons, and that consequently she could not carry it in her own name but had to have two names.

On July 6, 1927, the decedent opened an additional account, numbered 340658, with the South Brooklyn Savings Bank, the initial deposit being $1,000.

On July 22, 1930, these two accounts in the South Brooklyn were merged into another account, numbered 371332, the totals as transferred aggregating $2,537.40. This new account was closed on January 4, 1936, at which time the decedent withdrew the balance totaling $2,945.96. On the same day she opened the account which is the subject-matter of this proceeding with an initial deposit of $2,500.

The bank book the decedent kept in a bag among her effects and the present respondent abstracted it therefrom, together with approximately $100 in cash, after her death.

It was demonstrated to the satisfaction of the court that the respondent first attempted to conceal all knowledge of this account and of the money from the statutory distributees of the decedent, but after information regarding it had leaked out, adopted a defiant

attitude, stating that he had it and no one could take it from him; that the decedent had cheated and defrauded the Masons; that she had been a grafter on more people than Masonry; and that " money's money and findings is keeping."

He appeared as a witness on the hearing and presented a rather sorry spectacle, at the end admitting deliberate perjury in the early part of his testimony.

It was demonstrated that in 1930, in purported compliance with her agreement respecting the devolution of all of her assets to the Masonic trustees, the decedent, with the assistance of one of the lodge officers, had executed a will leaving everything except minor personal belongings to the lodge. This was delivered to her and was not found by the administratrix or any other responsible person among her effects in the bag in which she kept her valuables. As this had been rifled by the respondent promptly after her death, it is conceivable that he may have taken it at the same time that he appropriated the bank book and money. There is, however, no proof of this and the combination of his denial that he took it, with the demonstration of his utter unreliability as a witness, does not furnish affirmative proof that the reverse of his statements represents the fact. Under the circumstances, therefore, it must be held that the document was destroyed by the decedent *animo revocandi*. (*Matter of Sharp*, 134 Misc. 405, 406; affd., 230 App. Div. 730; *Matter of Ford*, 135 Misc. 630.)

If the decedent actually did so, it would make her offense the more egregious since it would demonstrate that even in death she preferred, if possible, to benefit a stranger in blood rather than to comply with her agreement, and solve her deep debt of gratitude to those who had supported her for more than half a generation.

The material facts hereinbefore recited are not controverted, the sole question of importance urged by the respondent being the legal one of whether or not the Masonic lodge in question became a creditor of the decedent by reason of its payment to her of the sum of upwards of $4,000 in reliance upon her false and fraudulent representations.

The authorization in section 19 of the Personal Property Law to an executor or administrator to treat as void and resist any act done or agreement made in fraud of the rights of any " creditor " is obviously construable in connection with the definitions of the beneficiary of such action as described in section 270 of the Debtor and Creditor Law and in subdivision 3 of section 314 of the Surrogate's Court Act. They are in substance the same, the former reading: " ' Creditor ' is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed

or contingent " and the latter providing: " The word 'debts' includes every claim and demand upon which a judgment for a sum of money, or directing the payment of money, could be recovered in an action; and the word ' creditor ' includes every person having such a claim or demand."

The question thereupon arises as to whether the conceded facts are such as to give rise to a claim or demand upon which a judgment for a sum of money could be recovered by the lodge, individually and as agent for the Trustees of the Masonic Hall and Asylum Fund.

In the opinion of the court there are three theories, any one of which would not only warrant but require the award of such a judgment.

The *first* is upon the express agreement by the decedent that she would " transfer * * * all property I may now be possessed of, and all which may hereafter come to me." It may be urged that this agreement was conditioned on the admission of the decedent to the home, which did not occur. This would be a narrow and legalistic interpretation of the arrangement entered into between the parties. What the applicant sought was support. That she was aware that such relief might be accorded in either of two modes as a result of such application, namely, by her actual transfer to the home or by the award of support for her in her own home, by what was termed " home relief," is an inevitable inference from the grant of the latter alternative to her husband under an identical application. Furthermore her established statements to her friends respecting her property obligations to the Masons in return for her support and her purported compliance with the requirement for testamentary fabrication in their favor, leave no room for doubt of her complete understanding of the existence and scope of her obligation under her agreement, amounting in effect to a practical construction thereof, which will control. (*Woolsey* v. *Funke*, 121 N. Y. 87, 92; *Syms* v. *Mayor of New York*, 105 id. 153, 157; *French* v. *Carhart*, 1 id. 96, 102; *Clark* v. *Carolina & Y. R. R. Co.*, 225 id. 589, 593; *City of New York* v. *New York City R. Co.*, 193 id. 543, 548; *Carthage T. P. Mills* v. *Village of Carthage*, 200 id. 1, 14; *Brooklyn Public Library* v. *City of New York*, 250 id. 495, 501; *Gerard* v. *Bank of N. Y. & Trust Co.*, 265 id. 336, 341; *Zimmerman* v. *Roessler & Hasslacher Chem. Co.*, 246 App. Div. 306, 315; *Taber* v. *First Citizens Bank & Trust Co.*, 247 id. 580, 587.) On the basis of this theory, there was a continuous breach of an express agreement on the part of the decedent upon which a direct right of recovery at all times existed and which survived her death.

The *second* theory available to the claimant, if the one last considered were to be deemed inapplicable, is that of quasi-contract as enunciated in *People ex rel. Dusenbury* v. *Spier* (77 N. Y. 144, 150) and applied in many subsequent cases. (*Miller* v. *Schloss*, 218 N. Y. 400, 407; *Knee* v. *Yankee Waist Co.*, 167 App. Div. 753, 756; *Kittredge* v. *Grannis*, 215 id. 491, 499; *Munger Vehicle Tire Co.* v. *Rubber Goods Manufacturing Co.*, 39 Misc. 817, 818, 819; *Wilkenfeld* v. *Lynn*, 55 id. 270, 271.)

This principle, as stated in *People* v. *Spier* (at p. 150), is as follows: " There is a class of cases where the law prescribes the rights and liabilities of persons who have not in reality entered into any contract at all with one another, but between whom circumstances have arisen which make it just that one should have a right, and the other should be subject to a liability similar to the rights and liabilities in certain cases of express contract. Thus, if one man has obtained money from another, through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass, such money may be recovered back, for the *law* implies a promise from the wrong-doer to restore it to the rightful owner, although it is obvious that this is the very opposite of his intention. Implied or constructive contracts of this nature are similar to the constructive trusts of courts of equity, and in fact are not contracts at all."

The basis of this doctrine is further developed in *Miller* v. *Schloss* (218 N. Y. 400) in which the opinion (at p. 407) reads: " A quasi or constructive contract rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In truth it is not a contract or promise at all. It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex æquo et bono* belongs to another. Duty, and not a promise or agreement or intention of the person sought to be charged, defines it. It is fictitiously deemed contractual, in order to fit the cause of action to the contractual remedy."

In the case at bar, were it to be deemed that the express agreement was inapplicable by reason of its reference to admission to the home, this principle would supply as perfect basis for a successful cause of action permitting recovery against the decedent, as the most exacting could desire.

The final basis for recovery by the claimant against the decedent sounds in tort and not in contract and is found in the ordinary

action for deceit, which on the presently demonstrated facts is so well established as to render abundant citation superfluous. (See, however, *Laska* v. *Harris*, 215 N. Y. 554, 556, 557; *Hubbell* v. *Meigs*, 50 id. 480, 491; *Hubbard* v. *Briggs*, 31 id. 518, 529.) In such an action recovery is obtainable " upon the application of a principle of natural justice, long recognized in the law, that fraud or deceit accompanied with damage is a good cause of action." (*Upton* v. *Vail*, 6 Johns. 181,182.)

It follows, therefore, that the lodge in the present case was a creditor of the deceased, within the definition of the term, not on one ground only but on three.

The balance of the syllogism for recovery by the present administratrix is fully supplied by the opinion in *Matter of Weinberg* (*supra*). The transfer by the decedent, viewed either as of the time of the opening of the savings bank trust in question or as that of her death, was actually fraudulent within the description of section 276 of the Debtor and Creditor Law. The administratrix of the decedent is accorded authority by section 19 of the Personal Property Law to take the necessary steps to avoid it in the interest of creditors. The sum involved is less than the demonstrated claims of creditors. Finally, this court possesses jurisdiction under section 205 of the Surrogate's Court Act to compel the delivery of property wrongfully withheld from an estate fiduciary. It follows that a decree must issue awarding her this savings account.

It has further been demonstrated that the respondent unlawfully appropriated $94.01 which was contained in the effects of the decedent at the time of her death. The decree will accordingly direct his delivery or payment of this sum in addition. His claimed offsets for alleged payments from this sum cannot be allowed at this time. If actually made, which has not been proved, they were merely payments of ordinary debts of the deceased which were not entitled to preference over the debt owed to the lodge. Even with the recovery of the savings bank account by the estate, it will be hopelessly insolvent, wherefore no creditor will be entitled to solution of his obligations in full. The respondent may claim subrogation to the claims, the payment of which he asserts. If duly presented and established as valid obligations, he will be entitled to *pro rata* payment thereof.

In the exercise of its discretion, the court will allow a full bill of costs to be taxed in favor of the petitioner and against the respondent personally.

Enter decree on notice in conformity herewith.